This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-37722**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**FRANK FROMETA,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Briana H. Zamora, District Judge**

Hector H. Balderas, Attorney General
Benjamin L. Lammons, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Santa Fe, NM
Victor E. Sanchez, Assistant Appellate Defender
Albuquerque, NM

for Appellant

## MEMORANDUM OPINION

**BOGARDUS, Judge.**

**{1}** Defendant Frank Frometa appeals his convictions for second-degree murder, pursuant to NMSA 1978, Section 30-2-1(B) (1994); tampering with evidence, pursuant to NMSA 1978, Section 30-22-5 (2003); and larceny ($250 or less), pursuant to NMSA 1978, Section 30-16-1 (2006). Defendant argues that the first two statements he made to authorities were involuntary and that the second two statements he made to authorities were presumptively inadmissible based on the influence from the prior involuntary statements. We affirm.

**BACKGROUND**

**{2}**     After being hit by a car, Defendant, who was homeless and in the hospital, told his nurse that he killed someone and that he wanted to speak to authorities about it. He then spoke to Detective Leah Acata and Detective Andrea Ortiz (collectively, Detectives) on three separate days, and admitted to killing Victim and stealing his accordion. Before trial, Defendant moved to suppress the statements and argued they were involuntary. After a hearing on the matter, the district court found they were voluntary and admitted the recordings of the statements. After a jury trial, Defendant was found guilty of second-degree murder, tampering with evidence, and larceny. Because this is a memorandum opinion and the parties are familiar with the facts and procedural history of this case, we reserve further discussion of specific facts where necessary to our analysis.

**DISCUSSION**

**{3}**     Defendant asks this Court to reverse the district court's denial of his motion to suppress because the three statements he made to Detectives were coerced by Detectives in numerous ways and therefore were involuntary.

**{4}**     When reviewing a district court's denial of a motion to suppress, we consider its findings of fact for substantial evidence, *State v. Leyba*, 1997-NMCA-023, ¶ 8, 123 N.M. 159, 935 P.2d 1171, and view them in the light most favorable to the prevailing party. *State v. Jason L.*, 2000-NMSC-018, ¶ 10, 129 N.M. 119, 2 P.3d 856. We then consider the district court's legal conclusions de novo. *Leyba*, 1997-NMCA-023, ¶ 8. "[W]e analyze de novo the question[] of whether a defendant's statement was voluntary." *State v. LaCouture*, 2009-NMCA-071, ¶ 9, 146 N.M. 649, 213 P.3d 799.

**{5}**     "Voluntariness means freedom from official coercion." *State v. Sanders*, 2000-NMSC-032, ¶ 6, 129 N.M. 728, 13 P.3d 460 (internal quotation marks and citation omitted). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). The Fourteenth Amendment right to due process (and the Fifth Amendment right against self-incrimination) prohibits the admission "of a confession elicited through intimidation, coercion, deception, assurances, or other police misconduct that constitutes overreaching." *State v. Setser*, 1997-NMSC-004, ¶ 9, 122 N.M. 794, 932 P.2d 484. "The use of any such tactics, which bear on the free will of the defendant, requires that the confession be excluded." *State v. Munoz*, 1998-NMSC-048, ¶ 23, 126 N.M. 535, 972 P.2d 847. For the confession to be involuntary, there must be an "essential link between coercive activity of the [s]tate . . . and a resulting confession by a defendant[.]" *Connelly*, 479 U.S at 165. Therefore, if the confession is "the product of an essentially free and unconstrained choice by its maker[,]" that is "if he has willed to confess, it may be used against him." *Culombe v. Connecticut*, 367 U.S. 568, 602.

**{6}** Whether a statement was made voluntarily is determined by an assessment of "the totality of circumstances[,]" which "includes an element of police overreaching." *State v. Montano*, 2019-NMCA-019, ¶ 16, 485 P.3d 512 (internal quotation marks and citation omitted); *see State v. Bregar*, 2017-NMCA-028, ¶ 5, 390 P.3d 212 ("We apply a 'totality of the circumstances' test to these claims[.]"). "On appeal, we determine the voluntariness of a statement by analyzing the entire record and the circumstances under which the statement was made." *LaCouture*, 2009-NMCA-071, ¶ 10.

## I. The District Court Did Not Err in Determining Defendant's First Statement Was Voluntary

**{7}** Defendant argues that the first statement he made to Detectives—when he first admitted to killing Victim—was involuntary for numerous reasons. He claims that he was coerced because (1) of the extended duration of the interrogation; (2) Defendant's physical and mental condition rendered him unable to withstand "direct" questioning; (3) Detectives' repeated questioning "suggested answers or pressured . . . [D]efendant to admit" to using the hammer; (4) Detectives told Defendant information about the case; (5) Detective Acata lied to Defendant, and (6) Detective Acata assured Defendant he could use a hammer in self-defense against Victim, despite self-defense being an issue of fact for a jury. We address each of Defendant's contentions in turn.

**{8}** Defendant claims that the duration of the first examination was coercive because of its length—43 minutes—and because the State did not establish that Defendant could withstand direct questioning in his condition. We note that Defendant requested to speak with law enforcement about a homicide, which is why Detectives came to the hospital in the first place. Detectives consulted with medical staff to make sure it was appropriate to speak with Defendant, that he was capable of communication, and to determine that the interview process would not cause him harm. After initially questioning Defendant, Detectives stopped the interview and checked with medical personnel a second time to reassure themselves that Defendant was able to withstand questioning before continuing with direct questions about the homicide. Before questioning him, Detectives went over Defendant's *Miranda* rights individually, and Defendant stated that he understood each right. He then told Detectives what occurred. Although he had a breathing tube in his throat and was difficult to understand, Defendant's answers corresponded to the questions asked. Because of Defendant's impaired ability to communicate, it was necessary for Detectives to repeat what he said to confirm it, which prolonged the interview. Defendant never asked for the interview to end or suggested that he was too tired to continue, or did not feel like talking anymore. *See Munoz*, 1998-NMSC-048, ¶¶ 35-36 (holding that 100 minutes was not an unreasonable length of time for an interview about homicide and citing to cases regarding voluntary interrogations lasting 5 hours, 19 hours, 4 hours, and 2 hours); *State v. Gutierrez*, 2011-NMSC-024, ¶ 29, 150 N.M. 232, 258 P.3d 1024 (holding that an interrogation of a sixteen year old lasting less than an hour during the late morning after the child received his *Miranda* rights was not involuntary); *State v. Garcia*, 2013-NMCA-064, ¶ 45, 302 P.3d 111 (holding that an interview lasting approximately one hour was not involuntary when nothing in the interview amounted to overreaching).

**{9}** During the first interview, Defendant initially maintained that he hit Victim with a rock and denied using a hammer. After Detective Acata asked him several times about the hammer, which she knew was used in the commission of the crime, Defendant admitted to using it. Defendant asserts that Detective Acata's repeated questioning "suggested answers or pressured . . . [D]efendant to admit" to using the hammer against Victim. He specifically contends that Detective Acata's repeated questioning renders Defendant's statement involuntary because such questioning is contrary to our holding in *LaCouture*.

**{10}** In *LaCouture*, this Court explained that an involuntary statement must "have been made in response to some 'element of official overreaching[,]' " . . . which includes "intimidation, coercion, deception, assurance, or other police misconduct that constitutes overreaching." 2009-NMCA-071, ¶ 11 (internal quotation marks and citations omitted). Here, Defendant has failed to point to any evidence that supports his contention of "official overreaching." Our review leads us to conclude that Detective Acata did not threaten Defendant, promise special treatment in return for Defendant's cooperation, physically abuse Defendant, or engage in intimidation. *See id.* ¶ 13. Detective Acata repeatedly confirmed that Defendant understood her questions and that she understood his answers. *See id.* ¶ 13. Although Detectives did repeat certain questions, our own examination of the audio record indicates that Detectives' repeated questioning was neither aggressive nor intimidating, but was done in a respectful manner. Defendant cites no authority to suggest that merely repeating questions during an interview is evidence of official overreach. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 (concluding that where arguments are not supported by cited authority, we presume counsel was unable to find supporting authority, will not research authority for counsel, and will not review issues unsupported by authority).

**{11}** Defendant next asserts his first statement to Detectives was involuntary because Detectives told Defendant information about the case and in support cites the interrogation in *State v. Rettenberger*, 1999 UT 80, ¶ 40, 984 P.2d 1009, cited favorably in *Bregar*, 2017-NMCA-028, ¶ 23. In *Rettenburger*, the confession "contain[ed] little information that was not first provided or suggested by the interrogating officers." 1999 UT 80, ¶ 40. However, in examining the totality of the circumstances, the court also considered that officers made several false statements to the defendant, including several fabrications, *see id.* ¶¶ 21-23; used the false friend strategy, *id.* ¶¶ 24-28; suggested a lesser punishment was possible based on what the defendant confessed, *id.* ¶¶ 29-32; and used solitary confinement between the two interviews, *id.* ¶¶ 33-34. *Rettenburger* is of little value here because the facts and circumstances of Defendant's interrogation are so dissimilar. Defendant volunteered the information that he killed Victim with a rock, described the location of the incident, and described Victim all without being given these specific details by Detectives. Only after providing these details, again after Defendant requested to speak to law enforcement and Detectives determined that Defendant's story was consistent with the homicide investigation, did Detectives begin to ask specific questions related to the hammer. Moreover, Defendant cites no authority to suggest that interviewers cannot disclose to the defendant

information about their investigation or ask specific details about physical evidence of which they are aware. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2.

**{12}** Defendant next asserts that Detective Acata lied to Defendant three times when she continued questioning Defendant after stating that she would return at a later time when he felt better. We disagree with Defendant's characterization of Detective Acata's statements. Although Detective Acata told Defendant that she planned to return next week, she never told Defendant that she would stop asking him questions or that she would not talk to him again until the next week. Our review of the interview indicates that Detective Acata's continued questioning consisted of follow up questions expanding on information Defendant had provided. We heard no evidence that Detective Acata's continued questioning included statements intended to deceive Defendant. There is simply no evidence that Detective Acata's statements regarding returning next week, and then continuing her questioning constitute official overreaching or were intended to coerce Defendant into an admission of some sort.

**{13}** Even assuming that Detective Acata's statements can be construed to be deceptive, there is no evidence that such deceptive statements led Defendant to an admission against his interest. *See State v. Evans*, 2009-NMSC-027, ¶ 46, 146 N.M. 319, 210 P.3d 216 ("[D]eception is not coercive per se. . . The degree of deception is but one factor in deciding whether a confession was" involuntary. (citation omitted)). We must "also consider [the d]efendant's probable reaction to those statements." *Id.* There is no evidence that Detectives' statements led Defendant to say something he would not have said the next week. Detectives came back a week later, as they said they would, and asked similar questions, including more questions about the hammer, to which Defendant readily responded. Simply put, the degree of deception, if any, was minimal, and there is no evidence that Defendant made statements based on any such deception.

**{14}** Defendant also asserts that Detective Acata made assurances of leniency to Defendant that were coercive. During their interview, Defendant claimed that Victim hit him with a knife. Detective Acata explained to Defendant, "It's okay if you did hit him with a hammer, it's okay because if he's trying to attack you can defend yourself, do you know what I mean?" "That's what I'm trying to explain. I understand if he's coming at you with a knife, you defend yourself. I get that. But if you used a hammer, it's okay, but I need to know that. Does that make sense?" Detective Acata's statements were not assurances that he would not be charged, or that he would be found innocent. Rather, such comments were explanations of the concept of self-defense and an attempt by Detective Acata to elicit a description of the role the knife played in the interaction. *Cf. Aguilar v. State*, 1988-NMSC-004, ¶¶ 3, 12, 106 N.M. 798, 751 P.2d 178 (holding that a confession was involuntary because the defendant had difficulty understanding if a deal had been made based on assurances by an officer when it was combined with his mental disabilities).

**{15}** Based on the totality of the circumstances, we conclude that Defendant's first statement was voluntary. Defendant's physical state, though certainly not that of an

uninjured, healthy person, was not so impaired as to transform Detective Acata's questions into official overreaching. Our own review of the record demonstrates that Defendant requested the first interview, was responsive, and was capable of understanding and answering Detectives' questions. Likewise, Detectives' conduct showed no traces of "official overreaching" due to Defendant's physical state, the duration of the interview, or Detective Acata's questions and actions. *See LaCouture*, 2009-NMCA-071, ¶ 14.

## II. The District Court Did Not Err in Determining Defendant's Second Statement Was Voluntary

**{16}** Defendant argues that his second statement to Detectives was coerced and therefore involuntary because Detective Acata made a collateral benefit promise to Defendant, and because Detectives ignored Defendant's invocation of his right to remain silent.[1]

**{17}** A collateral benefit promise is a "promise[] of collateral benefit or boon not relating to immunity from the consequences of the crime" that "render[s] a confession inadmissible as involuntary" when, under all the circumstances, it is "sufficiently strong to overcome the will of the declarant." *State v. Woo Dak San*, 1930-NMSC-019, ¶ 12, 35 N.M. 105, 290 P. 322. We disagree with Defendant's claim that Detective Acata made a collateral benefit promise to Defendant.

**{18}** Defendant requested to go to jail at the beginning of the interview and multiple times thereafter, even going so far as to say he would not speak to Detectives unless they promised to put him in jail because he was afraid he would die on the street because he was homeless. Detective Ortiz explained that she needed to make sure that the right person would be charged with the crime before putting anyone in jail. At the end of the interview, Detective Acata explained that because Defendant admitted to killing someone, he would be going to jail. Our review of the interview finds no instance of a promise by Detectives to take Defendant to jail in exchange for admissions and/or information. Detectives' statements relating to jail merely explain the need to verify Defendant's admission and the likely consequences based on Defendant's confession. We conclude that no collateral benefit promises were made to Defendant, and the district court did not err in determining that his statement was voluntary.

**{19}** Lastly, we address Defendant's argument that Detectives ignored his invocation of his right to remain silent. Having reviewed Defendant's motion to suppress as well as the arguments made at the suppression hearing, we conclude Defendant failed to preserve this argument. *See* Rule 12-321(A) NMRA ("To preserve an issue for review it must appear that a ruling or decision by the [district] court was fairly invoked."); *Progressive Cas. Ins. Co. v. Vigil*, 2018-NMSC-014, ¶ 31, 413 P.3d 850 (explaining that the purpose of preservation is "to ensure that (1) the district court is timely alerted to

---

[1]Defendant also claims that the State did not overcome the presumption of prior influence from the first statement and so the second statement is inadmissible. Because we determine that Defendant's first statement was voluntary, we need not address this argument.

claimed errors, (2) opposing parties have a fair opportunity to respond, and (3) a sufficient record is created for appellate review"). Because this argument is unpreserved, we decline to address it.

### III. The District Court Did Not Err in Determining Defendant's Third Statement Was Voluntary

{20} Because we uphold the district court's rulings admitting Defendant's first and second statements into evidence, we need not consider his sole argument as to the third statement—i.e., that his third statement was the result of prior influence.

### CONCLUSION

{21} We hold that Defendant's statements made to Detectives were voluntary. Accordingly, we affirm the district court's denial of Defendant's motion to suppress and affirm Defendant's convictions.

{22} IT IS SO ORDERED.

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**JENNIFER L. ATTREP, Judge**

**JACQUELINE R. MEDINA, Judge**